## Illinois Steel Company v. Michael Richter.

1. LIMITATIONS—*Declaration and Additional Count—What is Not a New Cause of Action.*—Where a declaration states as a cause of action, the placing " the hoisting engine in the care, management and control of an unfit, incompetent and unskillful person, by means whereof," etc., an additional count in which the adjective " unlicensed " is added next after the words " unskillful and incompetent," is not a statement of a new cause of action.

Trespass on the Case, for personal injuries. Trial in the Circuit Court of Cook County; the Hon. CHARLES G. NEELY, Judge, presiding. Verdict and judgment for plaintiff; appeal by defendant. Heard in this court at the October term, 1898. Reversed and remanded. Opinion filed March 30, 1899.

KEMPER K. KNAPP, attorney for appellant; ELBERT H. GARY, of counsel.

WORTH E. CAYLOR and WILLARD GENTLEMAN, attorneys for appellee.

MR. JUSTICE ADAMS delivered the opinion of the court.

This was an action on the case by appellee against appellant for an injury to the person alleged to have been occa-

sioned by appellant's negligence. The declaration, including an original and amendments thereto, contained six counts, but the case was tried on the last count only, filed February 24, 1898. In this count it is averred, in substance, as follows: Defendant, January 30, 1896, was possessed of and using a rail mill in the city of Chicago, and plaintiff was employed by defendant as a common laborer in and about a heating furnace in the mill. There was in the mill a hoisting apparatus and steam engine for the hoisting of large metal ingots of great weight, which ingots were hoisted by means of hooks or tongs. There was at said time an ordinance of the city of Chicago, which prohibited any person from taking charge of, managing or operating any steam engine or boiler, or any portion of a steam plant, in the city of Chicago, unless duly licensed so to do, under a penalty of not less than $20 nor more than $50 for each offense; and also imposing a penalty on any person, agent, firm, company or corporation, owning or controlling any steam engine, boiler, or steam plant, who should authorize or permit any unlicensed person to have charge of, manage, or operate the same, the penalty being not less than $50, nor more than $200 for each day's violation of the ordinance. Plaintiff was ordered by the foreman to work at the hoisting apparatus, and to fasten or hook the tongs about the ingots, for the purpose of hoisting them. It was defendant's duty to provide for plaintiff a safe place in which to work, the proper tools and appliances, and to have the steam engine under the care and management of a competent and skillful engineer; yet, plaintiff being in the exercise of reasonable care, defendant failed to provide for him a safe place to work, "and did then and there have said steam hoisting apparatus under the care and charge of an unskillful and incompetent and unlicensed engineer, contrary to the ordinance aforesaid, and not acquainted with the operation and manipulation of the same, and thereby, through the negligence, carelessness and improper conduct of the defendant in this behalf, a certain ingot of iron and steel, of great weight, to wit, of the weight of 1,600 pounds, then and there being hoisted," etc., fell on the plaintiff, etc.

The defendant pleaded the general issue, and the statute of limitations, to which latter plea a demurrer was sustained. The jury found for the plaintiff and assessed his damages at the sum of $8,000 and judgment was entered on the verdict.

It will be observed that the only breaches of duty alleged are failure to provide a safe place for plaintiff to work and the employment of an unskillful, incompetent and unlicensed engineer. There is no evidence that the place where appellee worked was an unsafe place for one exercising ordinary care. The only questions, therefore, are, whether the accident occurred by reason of any unskillfulness, incompetence, carelessness or mismanagement of the person operating the engine by means of which and the apparatus connected with it, the ingots were hoisted, and whether such person was unskillful, incompetent, etc. Appellee worked for appellant nine years, and at the time of the accident had been working two years at hoisting ingots. The ingots were hoisted for the purpose of piling them on the floor. They were sometimes piled fourteen feet high. The manner of hoisting, so far as the same appears from the evidence, was as follows: There was an upright derrick and a crane extending out from it. There was a cable attached to a drum on the engine which extended out to the end of the crane and was there attached to a heavy pair of iron tongs. At the lower end of each arm of the tongs there was a hole. Through each hole a point was inserted. When it was sought to hoist an ingot the men would bring the pair of tongs with these points in them together on the ingot, when a signal would be given to the engineer, who was in a shanty about sixty or seventy feet away, to hoist, who, in obedience to the signal, would apply the steam and the ingot would ascend. The tongs operated as do ice tongs. The men had long iron hooks for the purpose of pulling the ingots around when they were in the tongs and hoisted from the ground, and when they were too high to reach conveniently by the hooks, a rope attached to the crane was used, by means of which the ingot would be swung around as desired.

The accident happened between one and two o'clock P. M., June 30, 1895. There were six men altogether, engaged in the work of hoisting ingots. Nick Sobieski was at the engine sixty to seventy feet distant from the place where the tongs were attached to the ingots. Five others, of whom the appellee was one, were engaged in placing the tongs on the ingots. One of these five was Joe Nieman, called by appellee his partner, whose duty it was to give signals to Sobieski to hoist or to stop the engine as might be required. Appellee and Martin Drapinski attached the tongs to an ingot about 4½ feet long by 16 to 18 inches square and about 2,000 pounds in weight. Appellee says that he and Drapinski then walked away quite a distance from the ingot to give Sobieski a chance to raise it and the signal was given to hoist it. The appellee states as his reason for moving away, "We walked away, so when he takes the ingot up and jerks it, it would not swing and something would not happen." Nieman, appellee's partner, says: "As they hooked the tongs on they walked away, and I give him the signal to hoist up."

In his examination in chief, appellee thus describes the accident:

"The day I got hurt we worked that forenoon and the afternoon, working and lifting the ingots and putting them away, and he took it and he raised the ingot about three feet, and as he raised the ingot it was caught at the other ingots that was along side of it, and he was jerking it with the derrick, and my partner gave him a signal to stop and he stopped, and I went up and got hold of the ingot and commenced pulling it up and down, trying to loosen it. As I was loosening it the iron jerked up and then it dropped."

On cross-examination he testified:

"We walked away from the ingot before the engine was started to tighten the cable. We would put the tongs on first and then walk away, and then he would just take and raise it up. Just as soon as we would walk away, then Nieman would give the signal to the engineer to raise it up. This ingot had been raised just before the accident about three and a half feet. It caught at one end on another ingot. The tongs were attached to the ingot that fell, in the mid-

Illinois Steel Co. v. Richter.

dle. The ingot went up until it could not go any further, and then it got caught, and then it commenced to jerk, and then he told him to stop. When it started to go up, the ingot arose in a horizontal position. One end of the ingot caught on those ingots piled up there.

Q. Did the ingot then stop? A. It was jerking then.

Q. Well, then, did it stop? A. Then Nieman gave him the signal to stop.

Q. Then did it stop? A. Yes, sir.

Q. Then what did you do? A. I went up and got hold of it and stood up away from it.

The Court: He says he stood up.

The Witness. Yes, sir; I went up to it and catch it far away, and put my hands on it to loosen it, and it jerked and it fell."

John Walinski testified:

"Mike Richter and Martin Drapinski put the tongs on and it was raised up about three feet or three feet and a half by steam, and then Nieman gave Sobieski, the man that was running the engine, a signal to stop. He could not get the ingot up for another lay on top of that. It was not right on top. It was nearly a little over on one side. Then Richter went up and was going to swing the ingot around, and as he done that, why the ingot fell. I was about ten feet from the ingot when it fell. I was watching the ingot all the time. After Richter took hold of it the ingot jerked up a little and then fell on Richter's leg. It jerked once."

Martin Drapinski, who helped appellee to fasten the tongs to the ingot, testified:

"The ingot was drawn up three feet, then it fell down. Richter came up to it and wanted to turn it to one side, and just then it fell down. He wanted to get it away from among the others, for Nick Sobieski could not pull it out. I mean the engine could not pull it out. I did not take hold of it. I was standing about eight feet from Richter. I was watching the ingot all the time. Nieman was standing by me. I don't know what he was doing, for I was watching Richter coming with the ingot. Nieman's business there that day was helping us and giving signals. The last signal that I saw Nieman give to Nick Sobieski before Richter got hurt was he told him not to hoist. I didn't see any movement on the part of the ingot after Richter got

hold of it.   I saw it fall.   I didn't see any movement before
it fell."

The evidence with regard to the signals was as follows :
Appellee Nieman, Walinski and Drapinski all testified that
Nieman signaled Sobieski, who was in charge of the engine,
to stop.   None of them testified whether there was a sub-
sequent signal to hoist.   Walinski testified that, after appel-
lee took hold of the ingot, he was watching the ingot all
the time; that he was looking at the ingot and not at Nie-
man, the signal man.   Drapinski testified that he was stand-
ing about eight feet from appellee and watching the ingot;
that Nieman was standing by him, but as he was watching
appellee and the ingot he did not know what Nieman was
doing.

Nieman, who was called by the appellee, was not asked
whether he gave any signal after the signal to stop.   Appel-
lee's attention was necessarily directed to the ingot which
he was handling, so that he could not very well observe
what Nieman, who stood about eight feet from him, was
doing.   Sobieski testified that Nieman gave him a signal to
stop, which he did; that then appellee came up, caught the
ingot and tried to swing it around; that when it turned
around Nieman threw up his hands, which is the signal to
hoist, when he (Sobieski) put on a little steam and the ingot
dropped.   There is no contradiction of this evidence, and it
shows that if there was any negligence or carelessness in
the premises on the part of any of appellant's employes, it
was not that of the engineer.   He was sixty or seventy feet
away from where appellee and the ingot were; Nieman was
close to appellee and the ingot, and, therefore, in a much
better position to know whether the ingot had swung clear
of the other ingot on which the men were attempting to pile
it; it was Nieman's duty to give signals and Sobieski's duty
to obey them when given, and had he not obeyed them, and
by reason of such disobedience an injury had occurred,
appellant, waiving any question as to the law of fellow-
servants, would have been liable.   The evidence on the part
of appellee is that Sobieski was not a licensed engineer, and

that the regular engineer in appellant's employ was one Budniki; it also tends to show that Sobieski's employment was other than operating the engine, and that he had not operated it in the day time or, to the knowledge of any of appellant's witnesses, more than once prior to the time of the accident. This is the only evidence relied on by appellee in support of the allegation that Sobieski was unskillful and incompetent.

Appellant's witnesses testified as follows:

W. C. Clark, assistant superintendent of appellant's mill, in June, 1895, now in the tea and coffee business:

"I am an engineer myself. Sobieski was what I considered a thoroughly competent man in the line of operating the engines connected with the steel hoist near the heating pits at the rail mill. I have seen him running these engines times too numerous to mention. I have observed him while in the operation of these machines. He was not careless or incompetent in any way while I observed him. He was thoroughly competent. I never had any complaint whatever made to me as to his carelessness or incompetency. He had operated these engines off and on for fully a year or two before the accident."

William J. Matthias, night superintendent of the mill, testified that he knew Sobieski for two years prior to June, 1895; that he thought him competent to run the engine, and that he knew of his competency by putting him on that job once or twice a week during the two or three years he knew him.

Frank Simon, foreman of the mill, also testified to putting Sobieski to work on the engine, sometimes twice a day, and Sundays all day, and that he was competent and careful.

It is manifest that the fact that Sobieski was not licensed, is not evidence that he was incompetent or unskillful. Neither can we say, from the record, that, if he were licensed, this would be any evidence of competency or skillfulness, because only a single section of the ordinance is pleaded, and it does not appear from that section that any examination, or evidence of qualification, is required as a condition precedent to obtaining a license. We are of opinion, after a careful consideration of the evidence, that it fails

to prove that Sobieski was incompetent or unskillful, and especially that it fails to prove that the accident occurred by reason of any carelessness, negligence or unskillfulness of the engineer. In this connection we suggest, although the point has not been made, that the gist of the count under which the case was tried, is the employment of an unskillful, incompetent and unlicensed engineer, and there is no direct averment in the count that the accident occurred by reason of the unskillfulness or incompetency of the engineer.

The statute of limitations was pleaded on the theory that the count filed February 24, 1898, states a cause of action essentially different from that stated in the declaration filed October 11, 1895. In this view we can not concur. The former declaration stated, as a cause of action, the placing " the hoisting engine in the care, management and control of an unfit, incompetent and unskillful person, by means whereof," etc. In the latter count the adjective " unlicensed " is added next after the words " unskillful and incompetent." We do not think this a statement of a new cause of action.

The judgment will be reversed and the cause remanded.